# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANNA M. FIORE, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | 3:07-cv-00926 (CFD) |
| | : | |
| FAIRFIELD BOARD OF EDUCATION | : | |
| Defendant. | : | |

## RULING ON MOTION FOR SUMMARY JUDGMENT

The plaintiff, Anna M. Fiore, brought this action against her former employer, the Fairfield Board of Education ("Board"). Fiore alleges that the Board subjected her to discrimination on the basis of her religion and sexual orientation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60 et seq. Pending is the Board's motion for summary judgment.[1] For the following reasons, that motion is granted.

## I.    Background[2]

Fiore is a heterosexual, Catholic female who was employed as a non-tenured teacher by the Board from September 2002 through June 2006. On March 21, 2006, the Board voted not to renew Fiore's teaching contract at the end of the school year.

---

[1]The defendant also filed a motion to strike [Dkt. # 29] certain responses and documents cited by the plaintiff because they are inadmissible hearsay and because several documents were never submitted to the Court. Because the Court grants the defendants' motion for summary judgment even after considering all of the documents the plaintiff filed, it declines to rule on the evidentiary issues argued in the defendant's motion to strike.

[2]The following facts are taken from the parties' Local Rule 56(a) statements, summary judgment briefs, and other evidence submitted by the parties. They are undisputed unless otherwise indicated.

A.     **The 2004-2005 School Year**

From September 2002 through the 2004-2005 school year, Fiore was a fifth grade teacher at Timothy Dwight Elementary School ("Dwight").  Brenda J. Anziano became the principal at Dwight in September 2004.  Anziano is homosexual.  Up until the 2004-2005 school year, Fiore had generally received positive evaluations.

During the 2004-2005 school year, Anziano made several comments regarding Fiore's religion.  First, Fiore claims that Anziano called her a "Jesus freak" and a "neurotic Christian" on two occasions, once at the 2004 Christmas party and once during then 2005 Lenten season.  Anziano admits that she uses the term "Jesus freak," but claims that she does not use it in a derogatory manner, as she is a devout Christian herself.[3]  Second, Fiore claims that Anziano once asked her, "what kind of Christian are you," in response to Fiore's negative expression concerning certain other people.  Third, Fiore claims that Anziano told her to "get over your Catholic guilt," or said, "you and your Catholic guilt," on one occasion when Fiore was hesitant to call in sick.

While Fiore also admits that Anziano never made any comments about Fiore's sexual orientation, she does contend that Anziano made a sexual comment to Fiore at or around the Christmas party.  Specifically, Fiore asserts that when she mentioned that she had never seen pornography, Anziano said to Fiore, "oh, that's your problem," "you never saw porn," or "you need to see porn."

Anziano consistently gave Fiore favorable reviews through the fall and winter of the

---

[3]Anziano sometimes also referred to herself as a "Jesus freak" and said "[w]e all affectionately refer to each other as Jesus Freaks."

2004-2005 school year.  In mid-May 2005, five boys in Fiore's class told Anziano that Fiore told

their class she was "disgusted" with them, and that they were "the worst class she ever taught."

On May 25, 2005, Ms. Anziano received a complaint from the mother of a student who reported

that Fiore had "favorites" that upset the students.  On May 26, 2005, Fiore told Anziano that the

students were affecting her health.  On the same day, Anziano helped Fiore develop a behavior

plan to improve class behavior.  On May 31, 2005, Anziano received a complaint from two

parents that Fiore's classroom was negative and unmotivating, that she favored girls over boys,

and that she made negative comments to the students.  Another parent also complained that Fiore

had "broken my son's spirit" by making negative comments to them.

On June 3, 2005, during a school Field Day, Fiore admits that she sat alone for a period of

time instead of participating in the day's activities.  In response, when the school trip was over,

Anziano asked Fiore to come to her office.  Fiore emailed Anziano to ask about the purpose of

the meeting.  Anziano replied by email: "I only want to talk for a few minutes about how distant

and sad you appear.  I was very frustrated by you not having any interaction with kids today

while I was at Field Day."  Fiore replied that she was "not sad" but "just not feeling well."  After

school, Fiore went to Anziano's office, and asked two colleagues to wait outside the office.

Anziano attempted to close the office door, but Fiore did not allow her to do so.  Anziano claims

she attempted to express her concern about Fiore's behavior at Field Day, but that Fiore became

angry, hostile, and defensive.  Although the details of the meeting are disputed, the parties agree

that Anziano at some point became visibly upset and raised her voice to Fiore, at which point

Fiore left Anziano's office.

Fiore then went directly to the office of Margaret Mary Fitzgerald, the Assistant

Superintendent of Schools.  Although Fitzgerald was busy, Fiore and Fitzgerald met the next day, on June 4, 2005, to discuss the dispute between Fiore and Anziano.  At this meeting, Fiore did not tell or otherwise indicate to Fitzgerald that she believed the dispute with Anziano had anything to do with Fiore's religion or sexual orientation.  On June 6, 2005, Fitzgerald, Fiore, and Anziano met, and Anziano apologized to Fiore for raising her voice a few days earlier.  The parties agreed that going forward, a third party would be present during all meetings between Anziano and Fiore.  Fiore also claims that prior to the June 6, 2005 meeting she hand-delivered a letter to Fitzgerald outlining Anziano's behavior that she wanted stopped, including "inappropriate personal comments about me (religion, parental, animal interest)."

**B.**   **Fiore's Request for Transfer**

In the spring of 2005, Ms. Fitzgerald sent out an annual announcement letter to the Fairfield teachers inviting them to submit transfer requests or retirement intentions.  In response, Fiore "contacted Ms. Fitzgerald about transferring."  In a meeting in the Spring of 2005, Fitzgerald told Fiore that she could apply for a transfer, "but it is rare for a non-tenured teacher to receive a transfer."  At this meeting, which occurred before the dispute between Anziano and Fiore, Fiore admits that she did not discuss Anziano's comments about her religion.  Following this meeting, Fiore sent a letter dated May 31, 2005 to Fitzgerald requesting a transfer to "any and all positions" in the Fairfield Public Schools.  Anziano also claims that midway through the 2004-2005 school year, Fiore informed her that she would like a part-time, job-share kindergarten position for the 2005-2006 school year.

At the end of the 2004-2005 school year, after Fiore's dispute with Anziano, Fitzgerald offered Fiore a kindergarten position at Jennings Elementary School ("Jennings"), and Fiore

accepted it.  Before being offered and accepting the kindergarten position, Fiore was offered but

apparently rejected several positions in other grade levels.  <u>See</u> Pl. Resp. Interrog. at 3.

Fitzgerald claims the transfer was made in response to Fiore's expressed interest in teaching

kindergarten, as well as because it would be a good opportunity to provide Fiore with a "clean

slate" for the 2005-2006 school year.  Fiore asserts, and Fitzgerald denies, that the transfer was

made to move Fiore out of a "hostile environment."

     C.     <u>**The 2005-2006 School Year**</u>

During the 2005-2006 school year, Fiore was a kindergarten teacher at Jennings, where

Deborah Jackson was the principal.  Jackson had served as Anziano's mentor during the 2004-

2005 school year, Anziano's first as a principal at Dwight.  Fiore claims that Jackson and

Anziano were "good friends."  Fiore further argues that Jackson retaliated against her at Jennings

because of a negative bias fostered by her friendship and mentor relationship with Anziano.  The

parties dispute whether Jackson and Anziano ever spoke together about Fiore, and/or whether

Jackson knew anything about the circumstances of Fiore's transfer.  Fiore admits, however, that

Jackson bore no animus towards her because of her religion or sexual orientation.

Jackson contends that shortly after the 2005-2006 school year began, she started having

concerns about Fiore's ability to teach kindergarten, ability to communicate with parents and

staff, and ability to absorb criticism.  Jackson also received several complaints from parents

regarding Fiore's classroom management, communication with parents, interaction with students,

and discussion of personal life in the classroom.  Specifically, Jackson received complaints from

parents regarding first, Fiore's description of death to her students, and second, Fiore's

correspondence with parents prohibiting their attendance at kindergarten functions, including the

Thanksgiving party.

On December 6, 2005, Jackson observed Fiore's classroom for the first time.  During the observation, Jackson noted criticisms of Fiore's ability to properly manage her classroom, keep the children engaged, and teach the planned material.  Jackson also noted in Fiore's evaluation that Fiore was not meeting expectations in understanding how kindergarten students develop, in conducting herself as a professional in accordance with the Code of Professional Responsibility for Teachers, and in using self-evaluation regarding the effects of her conduct and choices on the students and school community.

On December 8, 2005, Jackson received a complaint from a mother who claimed Fiore dismissed her daughter to the wrong area for pick up, and the girl was left unattended.  Two other mothers claim that they witnessed the event and helped the girl when she was left outside alone.  After receiving the complaint, Jackson immediately contacted Fiore to discuss the incident and obtain an incident report.  When Jackson met with Fiore to discuss the incident that day, Fiore denied that she left the girl outside unattended.  Jackson claims that Fiore was defensive and argumentative during the meeting, and arranged a meeting with Fitzgerald.  Fiore submitted an incident report that indicated that the girl mistakenly waited in the wrong pick up line and left temporarily until Fiore retrieved her.  Fiore's incident report did not coincide with the witnesses' account of the incident.

On December 19, 2005, Jackson, Fitzgerald, Fiore, and Fiore's union representative met to discuss the December 8th meeting.  This was the first time Fitzgerald learned of any difficulties between Jackson and Fiore.  At this second meeting, Jackson claims that she attempted to explain her concerns about Fiore's teaching style and ability to accept feedback, but

Fiore remained defensive.

On January 11, 2006, Jackson, Fiore and Fiore's union representative met to discuss Fiore's first observation in detail. Jackson made several suggestions and offered guidance regarding how Fiore could improve her teaching skills. Jackson claims that Fiore was again defensive at this meeting. Fiore requested that Jackson observe her for a second time, and Jackson agreed.

On January 27, 2006, Jackson observed Fiore again. Jackson claims that she noted some improvement, but Fiore was still lacking in several areas, including classroom management, teaching, and "reflection on student learning." Jackson also claims that she continued to have concerns about Fiore's willingness to accept criticism. On February 16, 2006, Jackson, Fiore, and Fiore's union representative met to discuss her second observation. Jackson stated her concerns about Fiore's performance and attitude, and informed her that she would not be recommending her for contract renewal at the end of the 2005-2006 school year.

> **D.**    **Fiore's Non-Renewal**

On February 22, 2006, Jackson submitted a memorandum to Fitzgerald not recommending Fiore for contract renewal, summarizing her reasoning, and outlining the steps she took throughout the year to help Fiore improve. Jackson claims that she did not recommend Fiore for renewal because she believed that Fiore was not a "good fit" for either Jennings or the Fairfield Public Schools.

On February 27, 2006, Fitzgerald received a letter from Fiore contesting Jackson's recommendation for non-renewal. In her letter, Fiore claims that Jackson was attempting to dismantle her career because of a negative bias against her that was fostered by Jackson's

friendship and mentor relationship with Anziano.  In the letter, Fiore also claimed that Anziano called her a "Jesus freak," a "neurotic Christian," an "animal freak," and a "neurotic Mother."

After receiving Fiore's letter, Fitzgerald investigated the matter, and claims that she could not find any evidence to prove that Jackson was biased, or that Jackson was intentionally trying to end Fiore's career.  Fitzgerald claims that she did determine that Jackson's recommendation for non-renewal was based on the legitimate expectations of a classroom teacher.  On March 17, 2006, Fitzgerald sent a letter to Fiore indicating her findings of the investigation and indicating that she agreed with Jackson's recommendation for non-renewal.  On March 21, 2006, the Board voted to non-renew Fiore's contract.  The Commission on Human Rights and Opportunities ("CHRO") received Fiore's complaint on March 23, 2006.[4]

## II.   <u>Summary Judgment Standard</u>

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).  A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (<u>quoting</u> Fed. R. Civ. P. 56(c)); <u>accord</u> <u>Miner v. Glen Falls</u>, 999 F.2d 655, 661 (2d Cir. 1993). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248.

Because this is a discrimination case where intent and state of mind are in dispute,

---

[4]Fiore signed the complaint on March 20, 2006.

summary judgment is ordinarily inappropriate.  Carlton v. Mystic Transp., 202 F.3d 129 (2d Cir.

2000).  "The summary judgment rule would be rendered sterile, however, if the mere incantation

of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."

Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).  A plaintiff may not rely on conclusory

statements or mere contentions that the evidence in support of summary judgment is not credible.

Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); Henry v. Daytop Village,

Inc., 42 F.3d 89, 97 (2d Cir. 1994) ("The plaintiff must adduce evidence consisting of more than

mere conclusory or unsubstantiated statements.").  Similarly, a plaintiff, as the nonmovant, may

not rest "upon the mere allegations or denials" in its complaint to demonstrate the existence of a

genuine issue of material fact.  Fed. R. Civ. P. 56(e).  Therefore, after discovery, if the

nonmoving party "has failed to make a sufficient showing on an essential element of [its] case

with respect to which [it] has the burden of proof," then summary judgment is appropriate.

Celotex, 477 U.S. at 323.

## III.  Discussion

### A.  Discrimination Based on Religion and Sexual Orientation

Fiore claims she was discriminated against on the basis of her religion and sexual

orientation, in violation of Title VII and CFEPA.  The same standard applies to both claims.[5]  See

Feingold v. New York, 366 F.3d 138, 157 (2d Cir. 2004) (Title VII); Levy v. Comm'n on Human

---

[5]Title VII makes it unlawful for an employer "to discriminate against any individual with
respect to his compensation, terms, conditions, or privileges of employment, because of such
individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  "Title VII
does not prohibit harassment or discrimination because of sexual orientation."  Simonton v.
Runyon, 232 F.3d 33, 35 (2d Cir. 2000).  Unlike Title VII, however, CFEPA prohibits
discrimination based on sexual orientation.  Conn. Gen. Stat. § 46a-81c.  Thus, the Court will
only evaluate Fiore's sexual orientation-based discrimination claim under CFEPA.

Rights & Opportunities, 236 Conn. 96, 107 (1996) (CFEPA). Title VII and CFEPA claims in which there is no direct evidence of discrimination are analyzed under the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this standard, to establish a *prima facie* case of discriminatory treatment based on an adverse job action, a plaintiff must show "1) that he belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." Feingold, 366 F.3d at 152 (2d Cir. 2004). The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "de minimis." See Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005); Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001). Once a plaintiff has established a *prima facie* case, the defendant must then articulate "a legitimate, non-discriminatory reason for" the adverse employment action. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). If the defendant is able to do so, "the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action." Id.

The parties do not dispute that Fiore is a member of a protected class, that she was minimally qualified for her position, and that she suffered an adverse employment action in her non-renewal as a teacher in Fairfield. The Board contends, however, that Fiore has not presented evidence giving rise to an inference of discriminatory intent.

First, however, the Court finds that Fiore's transfer from Dwight to Jennings was not, as a matter of law, an adverse employment action. The record is clear that Fiore affirmatively contacted Fitzgerald to request a transfer, and that she spoke with Anziano about transferring to a

kindergarten class.  Fiore sent a letter to Fitzgerald on May 31, 2005, before her dispute with

Anziano, requesting a transfer to "any and all positions" in the Fairfield Public Schools.

Furthermore, even if Fitzgerald decided to offer Fiore options to transfer all or in part because of

the dispute with Anziano, these were still just offers–Fiore had the opportunity to, and in fact did,

turn down transfers offered to her for other positions in the Fairfield Public Schools.  Finally, to

the extent that Fiore claims her working conditions were so intolerable because of Anziano's

religious comments that she was "constructively transferred," the Court is not persuaded, even in

the context of assessing a summary judgment motion.  A constructive discharge occurs when

"the employer, rather than acting directly, deliberately makes an employee's working conditions

so intolerable that the employee is forced into an involuntary resignation."  Pena v. Brattleboro

Retreat, 702 F.2d 322, 325 (2d Cir. 1983) (internal quotations and citations omitted).  A

constructive discharge claim must entail something more than what is required for an ordinary

hostile environment claim.  See Penn. State Police v. Suders, 542 U.S. 129, 154 (2004).  As this

Court finds, *infra* Part III.C, that Fiore cannot survive summary judgment on her claim that

Dwight was a hostile work environment, it also finds she cannot establish that she was

"constructively transferred," particularly when she turned down other offers to transfer before the

Jennings position was offered.

      As to non-renewal, Fiore seeks to establish an inference of discriminatory intent by

presenting evidence that Anziano, rather than Jackson or Fitzgerald, made discriminatory

comments regarding her religion, and made one inappropriate sexual comment about

pornography.[6]  The defendant argues that evidence of "stray remarks" made by a person who is

---

[6]Fiore admits that Anziano made no comments regarding her sexual orientation.

not the decision-maker with regards to the adverse employment action cannot establish an inference of discriminatory intent.

A plaintiff can establish an inference of discriminatory intent through a number of means, including "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001) (internal quotation omitted). "While it is true that the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination," the Second Circuit has held "that when other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." Id. (internal quotations and citations omitted).

Fiore argues that the following remarks by Anziano give rise to an inference of discrimination: (1) one comment at the 2004 Christmas party and one comment during the 2005 Lenten season that Fiore was a "Jesus freak" and a "neurotic Christian"; (2) a question to Fiore asking "what kind of Christian are you"; (3) a comment to Fiore to "get over your Catholic guilt"; and (4) a comment regarding viewing pornography. These remarks by Anziano, without more, cannot establish an inference of discriminatory intent. The Second Circuit has recognized that "all comments pertaining to a protected class are not equally probative of discrimination." Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 115 (2d Cir. 2007). "[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." Id. Specifically, "[R]emarks made by someone other

than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark." Id. The temporal proximity of the remark to the adverse employment action may also be indicative of discriminatory intent. See Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 162-63 (2d Cir. 1998) (decision-makers use of age-related remarks close to the time of plaintiff's termination was a factor in determining discrimination).

Here, Fiore claims that only Anziano made discriminatory comments. Anziano, however, was not the decision-maker with regard to Fiore's non-renewal, and Fiore failed to show that the decision-maker, the Board, or the people who directly influenced the decision-maker, Jackson and Fitzgerald, were motivated by the alleged discriminatory sentiment expressed in Anziano's remarks. While Fiore seeks to present evidence that Jackson was biased against her because of Jackson's friendship and mentor relationship with Anziano, Fiore presents no evidence that Jackson's alleged bias was based on religion or sexual orientation. In fact, Fiore admits that Jackson bore no animus towards her because of her religion or sexual orientation. Thus, no evidence exists that Jackson, Fitzgerald, or the Board discriminated against Fiore on the basis of her religion or sexual orientation. Accordingly, Fiore has not established a *prima facie* case of discrimination.

**B.    Retaliation**

Title VII also forbids retaliation against an employee for complaining of prohibited employment discrimination, as follows: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a).

-13-

The plaintiff must make out a *prima facie* case of discrimination by presenting "evidence sufficient to permit a rational trier of fact to find (1) that she engaged in protected participation or opposition under Title VII, (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." Cifra v. G.E. Co., 252 F.3d 205, 216 (2d Cir. 2001) (internal quotation marks and alterations omitted).  If the plaintiff makes out a *prima facie* case, and the "defendant then points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation."  Id.

The parties do not dispute that Fiore engaged in a protected activity when she sent Fitzgerald her February 27, 2006 letter.  Fiore also argues that she engaged in a protected activity in June, 2005, when she had the dispute with Anziano following the school Field Day. Specifically, she claims that during the June 4, 2005 meeting, she told Fitzgerald about the "Jesus freak" and other religious comments.  Additionally, Fiore's June 6, 2005 letter states in relevant part that Anziano made "inappropriate personal comments about me (religion, parental, animal interest)."  The parties do not dispute that the Board took an adverse action against Fiore when she was non-renewed.  The defendant contends, however, that Fiore cannot present sufficient evidence of a causal connection between her protected activity and her non-renewal because Fiore's protected activity occurred only after Jackson decided to recommend her for non-renewal.

Fiore has not presented sufficient evidence of a causal connection between her protected

activity and non-renewal.  "A causal connection between the adverse action and the protected

activity, is established where a plaintiff offers, (1) direct proof of retaliatory animus directed

against the plaintiff, (2) disparate treatment of similarly situated employees, or (3) that the

retaliatory action occurred close in time to the protected activities."  Hunter v. St. Francis Hosp.,

281 F. Supp. 2d 534, 547 (E.D.N.Y. 2003).  First, Fiore sent Fitzgerald the February 27, 2006

letter after Jackson recommended non-renewal.  Second, as to the June 4, 2005 meeting and June

6, 2005 letter in which Fiore claims to have raised the issue of Anziano's inappropriate religious

comments, Fiore has not rebutted Jackson's affidavit, with anything other than her own

speculation, that Jackson knew of Fiore's June 2005 complaints.  Furthermore, Jackson's

recommendation of non-renewal occurred some eight months after Fiore's June 2005 complaints

about Anziano.  Thus, the Court finds that Fiore has failed to establish a *prima facie* case of

retaliation with regard to Jackson's recommendation for non-renewal.

### C.    Hostile Work Environment

"When the workplace is permeated with 'discriminatory intimidation, ridicule, and

insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment,' . . . Title VII is violated."  Harris v.

Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (citations omitted); see Mack v. Otis Elevator Co.

326 F.3d 116, 122 (2d Cir. 2003).  In evaluating the severity or pervasiveness of the allegedly

discriminatory workplace conduct, a court must look at all of the circumstances.  See Harris, 510

U.S. at 23.  A non-exclusive list of factors that courts consider in making such a determination

includes "the frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance."  Id.  Title VII is not "a general civility code," Oncale v.

Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998), and "[s]imple teasing, offhand

comments, or isolated incidents of offensive conduct (unless extremely serious) will not support

a claim of discriminatory harassment."  Petrosino v. Bell Atlantic, 385 F.3d 210, 223 (2d Cir.

2004).

     As to the frequency, "[t]here is no fixed number of incidents that a plaintiff must endure

in order to establish a hostile work environment." Alfano v. Costello, 294 F.3d 365, 379 (2d Cir.

2002).  The alleged incidents "must be more than episodic; they must be sufficiently continuous

and concerted in order to be pervasive."  Carrero v. New York City Housing Auth., 890 F.2d

569, 577 (2d Cir.1989); Kotcher v. Rosa and Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62 (2d

Cir. 1992) ("The incidents must be repeated and continuous; isolated acts or occasional episodes

will not merit relief.").

     The standard for evaluating a hostile work environment claim is both subjective and

objective: the victim must subjectively perceive the environment to be abusive so that it actually

alters the conditions of the victim's employment, and the conduct must also be so pervasive or

severe that a reasonable person would find the environment abusive.  Torres v. Pisano, 116 F.3d

625, 632 (2d Cir. 1997).  Here, Fiore has failed to establish a genuine issue of material fact as to

whether the conduct was so severe or pervasive that a reasonable person would find the

environment abusive.

     Fiore's claims of hostile work environment are the following comments during the 2004-

2005 school year: Anziano calling Fiore a "Jesus freak," or a "neurotic Christian"; Anziano's

comment "what kind of Christian are you"; and Anziano's comment about Fiore's "Catholic

-16-

guilt."   These four comments, occurring over the course of a school year, are not severe and

pervasive, but are rather "[c]asual comments, or accidental or sporadic conversation" that the

Second Circuit had held do not constitute hostile work environment.  See Snell v. Suffolk

County, 782 F.2d 1094, 1102 (2d Cir. 1986).  Fiore herself stated that Anziano's comments did

not come from a place of animosity toward Fiore's religion, but rather that Anziano "does not

think before she speaks."  A reasonable person would not find these comments severe or

pervasive enough to find the work environment abusive.

**IV.**    **Conclusion**

For the reasons set forth above, the defendant's motion for summary judgment [Dkt. #

21] is GRANTED.  The Clerk is directed to close this case.

SO ORDERED this ___1st___ day of September 2009, at Hartford, Connecticut.


 **/s/Christopher F. Droney**_____
 **CHRISTOPHER F. DRONEY**
 **UNITED STATES DISTRICT JUDGE**